No. 25,561.

THE STATE OF KANSAS, *Appellee,* v. W. M. STRYKER, *Appellant.*

SYLLABUS BY THE COURT.

1. EMBEZZLEMENT—*Bank Check—Evidence.* The evidence considered, and held sufficient to prove embezzlement of a bank check.

2. SAME—*Evidence—Examination of Witnesses—Proof of Forgery—Instructions.* Assignments of error relating to pertinency of testimony, conduct of court and counsel in the examination of a witness, sufficiency of proof of forgery, and instructions to the jury, considered, and held to be without merit.

Appeal from Cowley district court: OLIVER P. FULLER, judge. Opinion filed June 6, 1925. Affirmed.

*S. B. Amidon, S. A. Buckland, H. W. Hart,* and *Glenn Porter,* all of Wichita, for the appellant.

*Charles B. Griffith,* attorney-general, *C. A. Burnett,* assistant attorney-general, and *C. H. Quier,* county attorney, for the appellee; *Albert Faulconer,* of Arkansas City, of counsel.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted on three counts of an information charging embezzlement and forgery, and appeals.

The transactions occasioning the prosecution occurred in the year 1922. Defendant was arrested on May 30, 1923, on a warrant issued on May 17. The preliminary examination occurred on June 27. The information was filed on October 30, and the trial occurred in December. One count of the information charged embezzlement of a bank check, referred to, for convenience, as the Gassman check. The other counts charged forgery of the indorsement on a check referred to as the Workman check, and embezzlement of the check.

The governing body of school district No. 2, Cowley county, was the board of education of Arkansas City. Defendant was clerk of the board. W. H. Lightstone, Jr., was treasurer. Defendant was also president of the Security National Bank of Arkansas City, and was active officer in charge of the bank's affairs. The board of education erected a senior high-school building. George H. Gassman and the Workman Plumbing Company were contractors. An overpayment was made to each contractor, and each contractor refunded the overpayment by check.

The overpayment to Gassman was refunded by his check for $4,000, dated June 10, 1922, drawn on defendant's bank, and payable to the order of Wm. Stryker, clerk of the board of education. The check was delivered to defendant personally by Gassman. On June 12 defendant handed the check to Ray Hume, a teller in the bank, and received from Hume for the check a cashier's check for $4,000, dated June 12, and payable to W. M. Stryker, clerk of the board of education. The Gassman check was not indorsed, but Hume took it without indorsement because it was handed to him by an officer of the bank. When Hume had written the cashier's check he laid it on defendant's desk.

The bank and the office of the treasurer of the board of education were but a short distance apart. The treasurer, who was the financial officer of the board, kept his account at the bank. Defendant transacted much of his business as clerk at the bank, the treasurer frequently saw defendant at the bank, and defendant was frequently at the treasurer's office. Defendant did not inform the treasurer of the Gassman check, the treasurer did not know of its existence, and

he never received the proceeds of it, or any money on account of the refunded $4,000.

On September 6 the cashier's check, indorsed in defendant's handwriting, was presented and paid. On September 6 a special $4,000 account appeared on the books of the bank, next to defendant's personal account. On September 8 a check for $2,000, drawn by defendant, was presented. Ben T. Ausmus, the employee in the bookkeeping department of the bank having general charge of the books, took the check to defendant and told him it overdrew his account. Defendant said it went on the other account, and Ausmus directed a bookkeeper to charge the check to the $4,000 account. The remainder of the $4,000 account went out on September 11, on three checks, of $500, $817.36 and $682.64, respectively, and the account was closed on that day. On the same day two deposits of $817.36 and $682.64 appeared in the account of defendant's mother, against which defendant was in the habit of drawing checks in her name. The deposit slips and checks relating to the $4,000 account, and the ledger sheet showing the account, were missing, and could not be produced at the trial. Defendant disposed of his interest in the bank in the latter part of January, 1923, and on May 28 left for California, to accept a position there on June 1.

The overpayment to the Workman Plumbing Company was refunded by its check for $2,607, dated August 31, 1922, drawn on the State Bank of Parsons, and payable to the order of "Treasurer School District No. 2." The check was sent to defendant by mail. It came back to the Parsons bank bearing the indorsement, "W. H. Lightstone, Jr., Treas. School Dis. No. 2," and was stamped paid on September 9. As in the case of the Gassman check, defendant said nothing to the treasurer about the Workman check, the treasurer knew nothing of it, did not indorse it, and received nothing from it or on account of it.

Defendant admitted appropriation of the proceeds of the Workman check. It is a touching story, and was presented in such a way that it was much more moving than it would have been if defendant himself had told it on the witness stand. He did not, however, see fit to testify in his own behalf. Only an outline can be given here.

Throughout the month of September, 1922, the deposit balances of the treasurer of the board of education with the bank ranged from $70,000 to $80,000. When the Workman check came to defendant the bank was in a bad way. If defendant gave the check

to the treasurer, the treasurer would·deposit it in the bank, and the money might be lost.  Of course defendant could not explain the delicate situation to the treasurer, and defendant undertook to save that money for the board of education by buying Liberty bonds. He took a draft of his own bank on the New England National Bank of Kansas City, Mo., for the amount of the check, $2,607, and sent the draft to the H. P. Wright Investment Company, of Kansas City, Mo., a dealer in investment securities, to pay for the bonds purchased.  A statement of the transaction was rendered by the investment company to defendant on September 5, 1922.  As indicated above, defendant severed his connection with the bank in January, 1923, and on May 28, 1923, left Kansas City, Mo., for California. It became known that a warrant for his arrest had been issued; a telegram was sent to him, and he returned.  After he was arrested and gave bond, he went immediately to Parsons, and among his papers in a box there was a manila envelope, which contained the Workman account, $2,600 in Liberty bonds and $7 in cash.  Two of the bonds were for $1,000 each.  After the preliminary examination, but before the information was filed, and probably on July 28, 1923, defendant made a formal tender of those bonds and that money to the board of education.  The tender was in writing, and the material portion reads as follows:

"I  .  .  .  hereby tender you United States government bonds in the sum of twenty-six hundred ($2,600) dollars, par value, together with interest coupons of April, 1923, and each period thereafter, and also the sum of seven ($7) dollars cash held by me as clerk of the said board of education, which said bonds were purchase by me from the proceeds of the check drawn by the Workman Plumbing Company to school district number two, dated August 31, 1922, the proceeds of which said check the said undersigned used to purchase said bonds, for the reason that said bank, at said time, was in an apparent failing condition, and the same was done to protect said school board, and which said bonds and money has been held by ·the undersigned in trust for said board of education and school district number 2, and which said bonds, together with the said seven ($7) dollars, the undersigned, W. M. Stryker, hereby tenders to the said board of education, and school district No. 2."

The attorney for the board made a memorandum of the numbers of the bonds, but the tender was refused, and thus the effort of a faithful and resourceful officer to protect funds needed for educational purposes came to naught.

Unfortunately, there are always doubting Thomases; and perhaps it did seem a little strange that, after defendant severed connection with the bank and before he left the state, he did not take

the bonds and money to the treasurer, make private and confidential explanation of how he had collected an overpayment to a contractor and then had conserved the money, and receive the thanks due him. Perhaps, too, it seemed strange that if, as self-constituted trustee for the board, defendant had the bonds and money in a box at Parsons when he discontinued his journey to California, he did not immediately take the envelope and its contents to the beneficiary, surrender the trust, and save any fuss about it. And then, what about the Gassman check? The zeal to protect the board displayed on September 5, when defendant purchased bonds with the Workman check, seems to have abated on September 6, when he opened a $4,000 account in the tottering bank with the cashier's check into which he had converted the Gassman check. So the state went on with the prosecution, and it showed great disrespect for the story when, in rebuttal, it produced the Wright Investment Company's statement of account sales, rendered on September 5. The statement showed that the investment company sold to defendant three Liberty bonds of $1,000 each, receiving in payment the draft on the New England National Bank for $2,607 and another draft for $444. The two drafts did not quite pay the price, and the balance due the investment company, $12.51, was stated. The numbers of the bonds sold to defendant were given in the statement. No bond purchased with the draft representing the Workman check corresponded in number to any bond tendered to the board of education.

Defendant contends the evidence does not show embezzlement of the Gassman check. In support of the contention defendant calls attention to the difference in identity between a check and the proceeds of a check, and cites the case of *The State v. Harcombe*, 48 Utah, 89. Harcombe had charge of the collection business of a firm of lawyers. In making a collection for the firm, he received from a debtor a check payable to the order of the creditor. Without authority, he indorsed the name of the creditor on the back of the check, and deposited it in the bank in his own name. He was prosecuted for embezzlement of the proceeds of the check as the property of the firm. The court held he embezzled the check, not the money. The forged indorsement did not bind the maker of the check; the bank had no authority to pay the check on the forged indorsement, and was liable to the maker for the money, and title to the money did not pass to the firm. Applying the case, defend-

The State v. Stryker.

ant says the Gassman check was payable to defendant as clerk, was presented to the bank on which it was drawn, was cashed in the regular course of business, and Gassman could have no recourse on the bank.

The Harcombe case was well decided, and it is pertinent to one feature of the case under consideration. Defendant forged the indorsement on the Workman check, converted it into a draft on the bank's Kansas City correspondent, and used the draft to buy Liberty bonds. He was guilty of embezzling the check. The Harcombe case does not, however, establish the principle that one having in his possession a check payable to his own order, but the property of another, cannot be guilty of embezzling the check if he cashes it and uses the proceeds for his own purposes, but must be guilty, if at all, of embezzling the proceeds.

The essence of embezzlement is fraudulent appropriation to one's own use of property or money intrusted to him, instead of keeping or applying it to the use for which he held it. The principle involved may be deduced from two cases, one cited by defendant, and one cited by the state. Potatoes were shipped to a commission merchant for sale. The potatoes were sold, but the proceeds were not accounted for. The potatoes were applied to the use for which they were received, and the money was embezzled, not the potatoes. (*State v. Crosswhite*, 130 Mo. 358.) The owner of a horse intrusted it to an agent to drive it about and accustom it to trains, and to sell it for $125 net to the owner. The agent drove the horse to another county, sold it for $60, and kept the money. The horse was not devoted to the purpose for which it was received, and the horse was embezzled, not the money. (*Henderson v. The State*, 55 Tex. Crim. Rep. 640.) In each case there was authority to sell. In one, title was passed pursuant to the trust. In the other, the trust was disregarded, and the property was fraudulently applied to the agent's own use. The principle is illustrated in the case of *Commonwealth v. Butterick*, 100 Mass. 1. Bartlett gave to Butterick a note to discount at a bank for Bartlett. Butterick sent the note, with others, to the bank for discount and credit of the proceeds to his own account. It was held that Butterick was guilty of embezzlement of the note. In the opinion the court said:

"The defendant, having received a note for the purpose of causing it to be discounted for Perley Bartlett, misappropriated and embezzled the note itself when he sent it to the cashier with other notes of his own, to be discounted

on his own private account, and procured the proceeds to be passed to his own credit. The verdict of the jury establishes the fact that this was done with a fraudulent and felonious intent. If so, the act of embezzlement was complete as soon as the note was delivered to the cashier to be thus misused." (p. 9.)

The premises of defendant's argument, stated above, are not accurate. The Gassman check was not presented and cashed in the regular course of business. Regular course of business required that the check be indorsed by the payee before it was charged to the account of the drawer, and defendant did not indorse it. It is not perceived, however, that indorsement or nonindorsement of the check is material to the question whether defendant embezzled it. If indorsement was resorted to as a means of effecting diversion of the check from the purpose for which it was held and fraudulent appropriation of it to defendant's own purposes, the fact that indorsement would make the course of the check through the bank regular would not change the nature of the offense.

The check was received by defendant for the sole use and benefit of the board of education. Notwithstanding the check was payable to defendant's order, he had no title to it, the relation of debtor and creditor was not created, and he had no interest in the check except to devote it to the purpose for which it was received. He had no authority to place the check to the credit of the treasurer's account at the bank. Whether or not the treasurer desired cash or credit was a matter for him to determine, and the sole means by which defendant could rightfully accomplish the purpose for which he received the check was by indorsing it and delivering it to the treasurer. Instead of that, he passed the check through the bank, whereby it was permanently lost to the board of education, and took for it another instrument, giving rise to a different set of legal relations. The cashier's check was in such form that defendant's position in the bank enabled him to use it as he pleased. He withheld it from the treasurer, and gave the treasurer no information respecting the refunding of the Gassman overpayment. Therefore he embezzled the check.

There is nothing else in the case of sufficient importance to require discussion. A few matters stressed in defendant's brief will be mentioned.

Ray Hume was examined with respect to whether defendant directed him to write the cashier's check payable to defendant's order.

The witness was slow to answer, asked to have a question repeated, did not give answers responsive to questions, and it seems to have been difficult to obtain from him what, if anything, he knew. Defendant's counsel obstructed the examination by useless repetition of long objections, and the court participated in the examination. The net result was that, to the best of Hume's knowledge, he acted under defendant's instructions, but was unable to say that he had a recollection of the conversation. Defendant criticizes the court, counsel for the state, and the testimony, and says defendant is in the unfortunate position that the jury were left to understand that Hume testified he acted under defendant's instructions. The criticisms are unwarranted. The testimony had a direct bearing on the issues. The court and counsel for the state appear to have been endeavoring to ascertain what the witness had to say. Without Hume's testimony, it would be a dumb jury that would not understand that what the bank teller did, in an irregular transaction personal to the bank president, was done under the president's direction.

Defendant complains because the court did not give the jury an instruction on the subject of circumstantial evidence. The offense of embezzlement was complete when, as indicated above, defendant traded the Gassman check for the cashier's check, and was established by direct evidence. The circumstantial evidence showing what became of the cashier's check, and some evidence which has not been referred to, was merely corroborative.

Defendant contends the evidence was not sufficient to prove forgery of the indorsement on the Workman check, "W. H. Lightstone, Jr., Treas. School Dis. No. 2." Forgery was proved by the testimony of Lightstone, who did not write the indorsement, who knew defendant's handwriting, and who gave it as his opinion the indorsement was in defendant's handwriting. In view of defendant's flimsy defense that he used the Workman check to buy Liberty bonds to protect the board, it did not require much evidence to fasten the forgery upon him.

Defendant complains that the jury were not advised that fraudulent intent was essential to conviction on the charge of embezzling the Workman check. Instead of saying it was necessary for the jury to find defendant made way with and converted the check to his own use with intent to defraud, the court said it was necessary

to find defendant fraudulently ·made way with and converted the check to his own use. In all other respects the jury were adequately and correctly instructed.

The judgment of the district court is affirmed.