60 F.3d 1486
 70 Fair Empl.Prac.Cas. (BNA) 625, 32
Fed.R.Serv.3d 867
Robin Floyd PANIS, Plaintiff/Appellant,
v.
MISSION HILLS BANK, N.A., et al., Defendants/Appellees.
 No. 94-3132.
 United States Court of Appeals, Tenth Circuit.
 July 31, 1995.
 
 1
 Dan E. Turner (Phillip L. Turner, with him on the brief), Topeka, KS, for plaintiff/appellant.
 
 
 2
 Paul E. Donnelly of Stinson, Mag & Fizzell, P.C. (David L. Heinemann and Scott C. Hecht, with him on the brief), Kansas City, MO, for defendants/appellees.
 
 
 3
 Before MOORE and EBEL, Circuit Judges, and H. DALE COOK*, Senior District Judge.
 
 
 4
 H. DALE COOK, Senior District Judge.
 
 
 5
 Robin Floyd Panis brought this action against Mission Hills Bank, N.A. (Bank) and its officers and directors, alleging that defendants discriminated against her on the basis of sex in violation of 42 U.S.C. Sec. 2000e et seq. Panis' complaint also alleged causes of action under Kansas law for conversion and breach of an implied-in-fact employment contract. The district court dismissed all of Panis' claims in granting defendants' motion for summary judgment. Panis now appeals from that grant of summary judgment and various procedural errors allegedly made by the district court. We affirm.
 
 I. Background
 
 6
 Panis is a married white female residing in Kansas City, Missouri. Panis has been married to Salvadore O. Panis ("Sal Panis") since April, 1987. From 1975 through April, 1990, Sal Panis was the manager of the "Garden Bank" branch of United Missouri Bank (UMB) in downtown Kansas City, Missouri.
 
 
 7
 Panis was employed by defendant Bank in May, 1988 as an executive banking representative. In March, 1989, Panis was appointed assistant cashier at the Bank.
 
 
 8
 On November 27, 1990, Sal Panis was charged with seven separate counts of executing a scheme to defraud UMB.[1] The Kansas City Star reported that Sal Panis had misappropriated between $77,000 and $100,000 from an elderly UMB customer. Sal Panis allegedly persuaded the UMB customer to invest in non-existent bonds and securities and to purchase cashier's checks made out to "Sinap" or "Sinap Enterprises" ("Sinap" is Panis spelled backwards). Neither the Star article nor the television news reports of Sal Panis' indictment mentioned Panis or her employment at the Bank.
 
 
 9
 On November 28, 1990, the Bank's officers and some of its directors learned of Sal Panis' indictment from the Star article or from the morning television news reports. The Bank officers and one director met that morning to discuss the potential impact that Sal Panis' indictment might have on the Bank's customers. The officers feared that the Bank customers would connect Panis to Sal Panis, and the Bank might thereby risk losing customer confidence and business. The officers advocated firing Panis that day, but the director proposed that Panis be placed on a leave of absence until the entire Bank Board of Directors could consider the matter. Panis' leave of absence began on November 28.
 
 
 10
 Prior to November 26, 1990, Panis had been promised a raise, which was to be retroactive to November 1, 1990. On November 26, 1990, Panis' supervisor, defendant Leon Rupp, authorized her pay raise on the expectation that Panis would receive her performance appraisal before the increase was reflected in her paycheck. The information to increase Panis' pay was electronically transferred to the Bank's payroll preparer on November 27, 1990. A pay statement was issued to Panis showing the increased salary. On November 28, 1990, after defendants learned of Sal Panis' indictment and placed Panis on full-pay leave, defendant Rupp directed the Bank's payroll preparer to "back out" the increased funds from Panis' deposited paycheck. Pursuant to Rupp's instructions, the payroll preparer used a three-way debit-credit form on November 30 to manually withdraw the increased amount from Panis' account, and then credited that account with the amount representing Panis' previous salary.
 
 
 11
 When the Board members met on December 18, 1990, they discussed whether Panis could be placed in a less responsible position at the Bank. Several directors expressed fear of the Bank's loss of customer confidence if Panis continued to work there. The small number of the Bank's staff also made it unlikely that another position could be offered to Panis.
 
 
 12
 One director raised the issue of whether the Board would view the termination issue in the same manner if the roles were reversed and a male officer's wife had been indicted. After discussion, all Board members were satisfied that the Board would have come to the same conclusion had the roles been reversed. The Board concluded that its best interest lay in terminating Panis' employment. One Board member suggested that Panis' accounts be audited. That audit found no irregularities in Panis' accounts.
 
 
 13
 The Bank's president called Panis on December 26, 1990, and offered her the opportunity to resign. Panis declined to resign, and the Bank then terminated her employment.
 
 
 14
 On April 1, 1991, Panis filed a charge of sex discrimination with the Kansas Commission of Civil Rights (KCCR). Panis' charge of discrimination named "Mission Hills Bank and its representatives" as respondents, but did not identify by name or title any of the "representatives." After investigation, the KCCR advised Panis that her case was being "administratively closed" and placed in KCCR's "inactive files." Panis then requested a right-to-sue letter.
 
 II. Discussion
 A. Summary Judgment Standard of Review
 
 15
 We review de novo the district court's grant of summary judgment and apply the same standard used by the district court. Applied Genetics Int'l. Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Deepwater Invs. Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir.1991).
 
 
 16
 Under Rule 56(c), the moving party has the initial responsibility to show that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the moving party meets this requirement, the burden shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. at 2552. The nonmoving party may not rest upon "the mere allegations or denials of [her] pleading...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.
 
 B. Sex Discrimination Claim
 
 17
 In granting summary judgment for the defendants, the district court found that Panis had not presented any evidence that defendants' termination of her employment was motivated by her gender. The district court also found that, under the burden allocation scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), defendants had articulated a legitimate, nondiscriminatory reason for discharging Panis when they stated that "[i]t was the conclusion of the Board of Directors that, because of her husband's actions, Ms. Panis' credibility with customers and Bank employees could hereafter be questioned concerning the safety of funds." The district court further found that Panis had not shown that defendants' reason for discharging her was a pretext for discrimination. The district court concluded that Panis' discharge because of the publicity surrounding her husband's illegal activities did not support a finding that she was discharged on the basis of her sex.
 
 
 18
 On appeal, Panis criticizes the district court's finding that defendants produced a legitimate, nondiscriminatory reason for discharging her. Because defendants did not conduct an investigation of either Panis or the impact, if any, of the indictment publicity upon the Bank's customers, Panis argues that defendants failed to justify, with objective evidence, their assumption that Panis' own credibility should be questioned. Without such justification, Panis suggests defendants' reasons were pretext and that it is more likely that defendants relied on a sexual stereotype that a woman's character traits reflect those of her husband. According to Panis, the district court erred in not recognizing the presence of that stereotype when finding defendants' discharge of Panis did not constitute sex discrimination.
 
 
 19
 Panis misunderstands the nature of defendants' burden in the three part burden shifting format set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employee's discharge. Id. at 802, 93 S.Ct. at 1824; St. Mary's Honor Center v. Hicks, --- U.S. ----, ----, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). To carry its burden of production, a defendant need only:
 
 
 20
 articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied on was bona fide....
 
 
 21
 E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir.1992).
 
 
 22
 Here, defendants consistently stated that Panis was discharged because the Bank's Board of Directors and officers feared a loss of customer confidence if Panis were somehow linked with her husband's indicted actions. Contrary to Panis' arguments, defendants are not required to provide evidence to justify their articulated reason or to persuade the Court that their reason was correct. Rather, once defendants articulated their reason for Panis' discharge, Panis then had the burden to persuade the district court that defendants' reason was unworthy of belief and a pretext to cover up discriminatory motives. See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir.1994); Drake v. City of Fort Collins, 927 F.2d 1156, 1160 (10th Cir.1991). The district court found that Panis did not tender any fact to support her assertion of pretext. Our review of the record supports the district court's conclusions as to the lack of facts suggesting pretext.
 
 
 23
 Our review of the record likewise finds that Panis failed to create a genuine issue of fact with her argument that defendants relied on a sexual stereotype that Panis was a mere reflection of her husband and would mirror his indicted conduct. Panis offered no specific facts to demonstrate that defendants acted pursuant to that stereotype. Instead, Panis only speculated that defendants "must have" held such a stereotypical belief when they terminated her employment. In Branson v. Price River Coal Co., 853 F.2d 768 (10th Cir.1988), we stated that a plaintiff's "mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Id. at 772. That statement applies here as well.
 
 
 24
 Panis also argues that the district court erred in finding that defendants would have fired a male employee in circumstances similar to Panis'. Panis attempts to place defendant Leon Rupp, the Bank's cashier and her former supervisor, in a position similar to that of her husband, by arguing that Rupp embezzled funds from her account when he authorized the "back-out" of her pay raise after Panis was placed on leave of absence. Panis contends that the Bank neither fired nor reprimanded Rupp for the withdrawal of funds from her account, thereby generating an example of disparate treatment by defendants based on gender.
 
 
 25
 Initially, we give no credence to Panis' argument that Rupp "embezzled" funds from her account. Under Kansas law, "embezzlement" requires that the person entrusted with the funds appropriate them for his own use. See State v. Stryker, 118 Kan. 620, 236 P. 849, 851 (1925); Bolton v. Souter, 19 Kan.App.2d 384, 872 P.2d 758, 761 (1993). Panis has not shown that Rupp "backed-out" her pay raise from her account with the intent of using those funds for himself. In contrast, Sal Panis' misappropriation of funds from the UMB customer for his own use is a clear example of embezzlement. Additionally, Panis' attempt to set up a disparate treatment example using Rupp fails because she has not shown that Rupp was similarly situated to her. See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 532 (10th Cir.1994) (to make a comparison demonstrating discrimination, plaintiff must show employees were similarly situated). It is undisputed that Panis was not discharged for criminal actions on her part, and that her husband did not work for the Bank, thus flawing her attempted comparison with Rupp. No evidence was presented that Rupp or any other Bank employee's family was linked to unfavorable publicity that could cause the Bank to fear the loss of its customers' confidence and business. Panis thus has not carried her burden of proof on her disparate treatment argument. See E.E.O.C. v. Flasher, 986 F.2d at 1320 (plaintiff must prove why differential treatment occurred and that it was caused by intentional discrimination against a protected class).
 
 C. Conversion Claim
 
 26
 With its dismissal of Panis' discrimination claim under Title VII, the district court declined to exercise jurisdiction over the pendent state-law claims in Panis' complaint, including the cause of action for conversion under Kansas law. Even if it did exercise pendent, or what is now termed supplemental, jurisdiction over the conversion claim, the district court concluded that that claim failed as a matter of law. The district court found that, under Kansas law, a depositor may not sue a bank for conversion of funds from a checking account, relying on Temmen v. Kent-Brown Chevrolet Co., 227 Kan. 45, 605 P.2d 95, 99 (1980). The district court also found that Panis did not have actual possession of the disputed funds or the right to immediately take possession of those funds, and thus could not claim a conversion of the disputed funds, citing Gillespie v. Seymour, 14 Kan.App.2d 563, 796 P.2d 1060, 1066 (1990).
 
 
 27
 Panis bases her claim of conversion upon the fact that the signature card on her account authorizes only Panis as the sole person to withdraw funds from that account. Panis alleges that defendant Rupp knew that fact, and without her authorization Rupp withdrew the pay raise promised Panis from her account. Panis claims that the district court erred in relying on the two Kansas decisions to find that she had no cause of action for conversion against the Bank.
 
 
 28
 Pursuant to 28 U.S.C. Sec. 1367(c)(3), a district court has discretion to decline to exercise supplemental jurisdiction once it has dismissed the claims over which it had original jurisdiction. We find the district court did not abuse that discretion in dismissing Panis' conversion claim. Additionally, we agree with the district court's assessment that Panis' conversion claim failed as a matter of law. Despite her criticism of the district court's reliance upon the above-cited Kansas decisions, Panis failed to cite a Kansas decision which either supported her conversion argument or refuted the decisions relied upon by the district court.
 
 D. Breach of Implied-in-Fact Contract Claim
 
 29
 Under the employment-at-will doctrine in Kansas, employment is terminable at the will of either the employer or the employee for good cause or no cause at all. See Johnson v. National Beef Packing Co., 220 Kan. 52, 54, 551 P.2d 779, 781 (1976). The Kansas courts have developed an exception to the employment-at-will doctrine, stating that an employer may not treat an employee as one at will when there has been an implied agreement to the contrary. Morriss v. Coleman Co., 241 Kan. 501, 509, 738 P.2d 841, 848 (1987).
 
 
 30
 Whether an implied-in-fact contract exists is a question of fact. Id. A mutual intent to form a contract is necessary to show that an implied-in-fact contract exists. Atchison County Farmers Union Co-op Ass'n v. Turnbull, 241 Kan. 357, 363, 736 P.2d 917, 922 (1987). A unilateral expectation on the part of the employee does not create an implied-in-fact contract for continued employment. Harris v. Board of Public Utilities of Kansas City, 757 F.Supp. 1185, 1190 (D.Kan.1991). A reasonable person must be able to find from all relevant circumstances of the plaintiff's employment that there was an intent on both sides to be bound. Berry v. General Motors Corp., 838 F.Supp. 1479, 1492 (D.Kan.1993).
 
 
 31
 To determine the parties' intent when considering whether an implied-in-fact contract existed, the Kansas Supreme Court has endorsed the following language
 
 
 32
 Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.
 
 
 33
 Morriss, 241 Kan. at 510, 738 P.2d at 847 (quoting Allegri v. Providence-St. Margaret Health Center, 9 Kan.App.2d 659, 684 P.2d 1031, 1031 (1984)).
 
 
 34
 Panis claims that she had an implied-in-fact contract with the Bank that her employment there would not be terminated except for cause and that the Bank breached that contract when it terminated her employment without cause. Panis first asserts that the Bank told her that she would not be discharged but for cause. Panis has not pointed to any specific written or oral communication from the Bank or any of its officers or directors to support this assertion.
 
 
 35
 Panis also bases her claim of an implied-in-fact contract upon her participation in another Bank employee's discharge. During her employment with the Bank, Panis was asked to document another employee's shortcomings; that employee was later discharged. From this incident, Panis argues that the Bank evidenced its agreement that Bank employees would not be discharged without cause. Panis again has not pointed to any specific action or communication directed from the Bank to her, that indicated the Bank's intention to enter into an implied-in-fact contract with Panis. From our review of the record, we find that at most, Panis had only a unilateral expectation of continued employment with the Bank. As noted above, that expectation is insufficient to create an implied-in-fact contract. We find that Panis has not set forth facts to raise the issue that such a contract existed between the Bank and her.
 
 
 36
 Panis also alleges that defendants entered into an implied-in-fact contract with her, when defendant McElvain promised to conduct an investigation of the indictment publicity's impact upon the Bank's customers. According to Panis, defendant McElvain promised to "get in touch" or "get back with" Panis after conducting the investigation. Defendants do not dispute that they never made such an investigation before determining to discharge Panis.
 
 
 37
 Even accepting, as we must, Panis' version of defendant McElvain's promise to conduct an investigation, we fail to discern what, if any, rights or benefits Panis gained from that promise. As admitted by Panis, McElvain only promised to contact Panis after the investigation was concluded. McElvain did not convey to Panis that her employment was contingent upon the results of the investigation. Since McElvain did "get in touch" with Panis later when he asked for her resignation, defendants' failure to conduct an investigation did not breach any promise made to Panis. Panis may have held the unilateral expectation that the Bank would call her back to work after making its investigation, but once again, Panis' unilateral expectation of what the Bank would do is an insufficient basis for an implied-in-fact contract.
 
 E. Alleged Procedural Errors
 
 38
 Panis also appeals from procedural errors the district court allegedly committed. We briefly consider these alleged procedural errors seriatim.
 
 1. Dismissal of Individual Defendants
 
 39
 The district court determined that it did not have subject matter jurisdiction over the individual defendants because Panis failed to specifically name those defendants when she filed her charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the KCCR. Panis argues on appeal that her designation of the Bank and its "representatives" as respondents was sufficient to put the individual defendants on notice so as to be able to respond to her charge of discrimination.
 
 
 40
 In view of our finding that the district court did not err in granting defendants summary judgment on all of Panis' causes of action, we believe that the dismissal of the individual defendants did not affect any substantial rights that Panis may then have had in this action. Accordingly, we consider any error allegedly committed by the district court in dismissing the individual defendants to be harmless pursuant to 28 U.S.C. Sec. 2111 (1988).
 
 2. Defendants' Answers Filed Out-of-Time
 
 41
 Panis criticizes the district court's permitting the individual defendants to file their answers out-of-time. The Bank filed its answer four days after venue of the action was transferred to the district court from the Western District of Missouri. The Bank's answer failed to include the twelve individual defendants' names in its caption. When defendants' counsel discovered that omission approximately one month later, he promptly sought leave to file answers for all the individual defendants out-of-time. The district court granted such leave. When defendants' counsel eventually filed the out-of-time answer, defendant Leon Rupp's name was inadvertently left off the caption again. The omission of Rupp's name was not discovered until later in the action, although discovery on behalf of Rupp was conducted by defendants' counsel.
 
 
 42
 Panis objected to the out-of-time filing of defendants' answers. Panis sought default judgment against defendant Rupp for failure to answer, even though Rupp had responded, through defendants' counsel, to Panis' discovery requests. On appeal, Panis argues that the district abused its discretion in permitting the defendants to file their answers out-of-time and in denying Panis' motion for default judgment against Rupp.
 
 
 43
 Under Fed.R.Civ.P. 6(b), the district court had discretion to permit the late filing of defendants' answer if defendants could show that the delay was caused by "excusable neglect." In Pioneer Inv. Services v. Brunswick Associates, --- U.S. ----, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court considered "excusable neglect" in a context similar to this action. In Pioneer, creditors sought to file a proof of claim when the deadline set by the bankruptcy court had passed for such filings. The creditors claimed their late filing was due to "excusable neglect." Id. at ---- - ----, 113 S.Ct. at 1492-93. In construing the bankruptcy counterpart to Fed.R.Civ.P. 6(b)(2), the Supreme Court noted that "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake or carelessness, as well as by intervening circumstances beyond the party's control." Id. at ----, 113 S.Ct. at 1495.
 
 
 44
 We find the district court did not abuse its discretion in permitting defendants to file their answers out-of-time and in denying Panis' motion for default judgment against defendant Rupp. The record demonstrates that defendants' late filings were due to mistake, inadvertence or carelessness and not to bad faith on defendants' part.
 
 3. Denial of Leave to Amend Complaint
 
 45
 Panis next complains that the district court denied her leave to file an amended complaint. The district court found that Panis sought to file her amended complaint six months after the deadline for such filings had passed. The district court also found that the causes of action to be added by the amendment were based on facts available to Panis at the time she filed her original complaint. Panis asserts that the district court acted unfairly in allowing defendants to file their answers out-of-time, while strictly enforcing a deadline against Panis.
 
 
 46
 "The decision to grant leave to amend a complaint, after the permissive period, is within the trial court's discretion, Fed.R.Civ.P. 15(a), and will not be disturbed absent an abuse of that discretion." Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1462 (10th Cir.1991). Untimeliness in itself can be a sufficient reason to deny leave to amend, particularly when the movant provides no adequate explanation for the delay. Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir.1994). "Where the party seeking the amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." State Distributors, Inc. v. Glenmore Distilleries Co., 738 F.2d 405, 416 (10th Cir.1984).
 
 
 47
 Panis' perceived unfairness in the district court's treatment of the parties' out-of-time filings does not convince us that the district court abused its discretion in this regard. We note first that the time in requesting leave to file justifies the difference in the district court's treatment of these filings. Defendants requested leave to file out-of-time soon after their omitted answers were discovered and before significant discovery had commenced. Panis, on the other hand, waited more than six months after the deadline to amend had passed, when most of the discovery had been completed and the case was ready for determination. Secondly, the prejudice factor in allowing these two filings was different in its impact upon the opposing party. Defendants' out-of-time answers were virtually identical and did not raise new issues. In contrast, Panis' amended complaint sought to add new causes of action which would have required that discovery be re-opened. Finally, defendants admitted that their reason for filing out-of-time were based on inadvertence or carelessness. Panis provided no explanation why she did not seek to amend her complaint before the deadline, when the amendments were not based on new evidence, but on knowledge she held at the time when she first filed this action. These differences provide us with ample grounds to approve the district court's actions.
 
 III. Conclusion
 
 48
 For the foregoing reasons, the district court's judgment is AFFIRMED.
 
 
 
 *
 Honorable H. Dale Cook, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 On February 5, 1991, Sal Panis pleaded guilty to federal bank fraud. On April 22, 1991, he was sentenced to 18 months in prison and ordered to pay UMB $60,027.00 in restitution