Steven E. FORD; C. Lynn Ford; Michael G. Ford, a Minor; and Beatrice Meierstein, Plaintiffs–Appellees/Cross–Appellants,

v.

ALLIED MUTUAL INSURANCE COMPANY, an Iowa corporation, Defendant–Appellant/Cross–Appellee.

Nos. 94–8069, 94–8077.

United States Court of Appeals, Tenth Circuit.

Jan. 3, 1996.

Stephen H. Kline, Kathryn A. Jenkins (Kline & Jenkins), Cheyenne, Wyoming, for Plaintiffs–Appellees.

Thomas J. Klepperich, Jeffrey J. Gonda (Lonabaugh and Riggs), Sheridan, Wyoming, for Defendant–Appellant.

Before BRORBY and McKAY, Circuit Judges, and OWEN,* District Judge.

* The Honorable Richard Owen, Senior District Judge for the United States District Court for the Southern District of New York, sitting by designation.

OWEN, District Judge.

Appellant Allied Mutual Insurance Company ("Allied") raises substantial questions as to Steven Ford and his family's entitlement to receive from Allied, as his insurer, "underinsured" motor vehicle payments ("UIM") following an accident with serious injuries. The appeal essentially involves the propriety of certain rulings by the district court on two summary judgment motions prior to trial. By those rulings, the court dismissed one defendant, United States Fidelity and Guaranty Co. ("Fidelity" or "USF & G"), a potential insurer, and thereafter held as a matter of law that Allied, the Fords' insurer, was liable under its UIM provisions for certain excess damages. A detailed recital of the facts and chronology of events places the issues in clear perspective.

On July 12, 1989, Steven Ford was driving his family in Yellowstone National Park in Wyoming. It had been raining. Rounding a bend in a narrow two-lane road, their car was struck by the trailer portion of a tractor-trailer rig, and the four occupants of the car sustained bodily injuries, two quite seriously. A jury later determined those damages to total $670,000. It was stipulated that the tractor-trailer driver, Leland Blatter, was the only negligent party in the accident.[1]

Ford, with considerable experience in the insurance field, personally undertook to obtain reimbursement for his and his family's injuries and property loss. He immediately got in touch with Allied, *his* insurance company, for reimbursement for the property damage to his car and the medical payments his policy provided. Both were promptly paid by Allied, $7,225 for the car and $5,000 (the policy limits) each to Ford and his wife.

It was early established that the tractor, which was owned by Blatter's family corporation under the name Farmer's Creamery, had a liability insurance policy with the Farmers' Insurance Group and specifically the Truck Insurance Exchange,[2] with total coverage of $300,000. Investigation in the months after the accident further developed that the trailer was owned by Rollins Leasing and was under lease to Gallatin Dairies, Inc. d/b/a "Darigold". Accordingly, both Allied and Ford tried to ascertain any coverage that Rollins and Darigold might have applicable to the Fords' injuries. Inquiries by Allied into Rollins' or Darigold's coverage were eventually met with one form or another of declination, and, as appears to be the practice in the trade, neither Rollins nor Darigold supplied Ford or Allied with their policies for examination.[3]

Getting toward the end of the first year after the accident, with the full extent of the Fords' injuries becoming determinable and with the Fords' need to obtain monies to deal with this, Ford began to pressure Allied to consider making the payments he and his family needed from its underinsured motorist clause with a right of subrogation against any other insurance, ascertained or yet to be ascertained.[4] Allied declined to do this, ad-

---

1. The accident occurred in Yellowstone National Park, a federal territory. In such circumstances, the applicable law is that of the state, Wyoming, in which the national park is located. 16 U.S.C. § 457 (1995). The Wyoming choice of law rule in this situation provides that the construction and validity of a contract is to be determined by the place where the contract was made. *J.W. Denio Milling Co. v. Malin*, 25 Wyo. 143, 165 P. 1113, 1116 (1917), *cited with approval in Isaac v. Isaac*, 406 P.2d 898, 898 (Wyo.1965). The parties do not disagree that apart from the place of the accident, all other relevant facts are connected to Iowa and that the law of Iowa should apply when even state law is applicable.

2. The names "Farmers Insurance" and "Truck Insurance" are hereafter sometimes used interchangeably in this opinion depending on whether the parties used one or the other in contemporaneous writings or testimony.

3. As is discussed hereafter, the customary way to get disclosure of such a policy, as Allied advised Ford, was to sue the insured trailer owner or lessee thereby forcing disclosure of the policy and its coverage.

4. The terms of Allied's UIM provisions read:

 We [Allied] will pay damages which a covered person is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury:
 1. sustained by a covered person; and
 2. caused by an accident.

 \* \* \* \* \* \*

 "Underinsured motor vehicle" means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but its limit for bodily injury liability is ... not enough to pay the full

vising Ford that it was only liable in the event it was determined that no other insurance was available to cover the Fords' losses. Allied, however, continued to work with Ford to endeavor to ascertain the existence and applicability of any other insurance.

On May 28, 1990, Ford wrote to Allied asking if it had any information on policies covering the trailer. On June 6, 1990, Allied wrote back telling Ford that it was still trying to get from the insurance carriers the coverage available on the trailer which Ford had requested, and until such coverage, if any, was known, no possible discussion of settlement of Allied's underinsured motorist insurance could be had.

In the summer of 1990, Blatter's insurance representative offered Ford the whole Truck Insurance $300,000 policy with the expectation that Leland Blatter and Farmers Creamery would thereupon be released from future liability. Ford, in need of funds, followed up on this. . Farmer's Insurance sent him a form release which he took to a lawyer and had the lawyer edit, reserving Ford's "rights against any other entities that he hadn't identified." Ford then wrote to Allied on July 6, 1990 asking Allied's permission to settle with Truck Insurance for "their portion of our claims." In the same letter, Ford made a claim for the entire underinsured motorist limit of the Allied policy. Ford acknowledged that Allied neither "encouraged" nor "discouraged" him from settling with Farmers. Allied did, however, set about to make an asset check on Blatter. This consisted of a property search and a check to see if there had been any filing of financial documents under the UCC. This was completed within approximately a month, and Allied then wrote Ford:

Allied Mutual Insurance Company has obtained an assets check on Mr. Blatter and have determined that there [are] no funds from which to collect any subrogation

claim against him. Therefore, you have Allied's permission to enter into a release with Mr. Blatter and Farmer's Insurance for your claim as well as those of your wife, son and Beatrice Meierstein.

In the immediately following paragraph, however, Allied further wrote:

Allied is still waiting for confirmation from Rol[l]ins Leasing Company as to their insurance limits. Any insurance per Rol[l]ins would come into effect prior to the UIM Coverage under your Allied policy.[5]

Thus, it continued to be Allied's stated position that if there were other insurance it had to be looked to before Allied could consider UIM payments. Upon receipt of Allied's letter, Ford signed the release he had tailored releasing Leland Blatter and Truck Insurance Exchange reserving, however, his right:

[t]o pursue claims against any and all other parties responsible for his injuries, including, but not limited to, Rollins Leasing, Gallatin Dairies, Country Classic Dairy, and Allied Insurance, which pursuant to the terms of an automobile liability policy has provided underinsurance coverage to Steven Ford.

Ford delivered this release to Blatter and Truck Insurance Exchange and received the $300,000.

Both Ford and Allied thereafter continued to pursue possible Rollins or Darigold coverage without success. Finally, according to a memorandum of Allied's Tim Jones in June 1991:

I advised Mr. Ford that there did not appear to be anything that we could do at this time [regarding UIM] since there is coverage available.

---

amount the covered person is legally entitled to recover as damages. . . .
The policy limits of the Allied policy were $250,-000 per person and $500,000 per accident or occurrence.

5. [Court's footnote] While Darigold's policy was not mentioned in this letter, other contemporane-

ous writings reveal that both Ford and Allied were increasingly aware of the Darigold policy both before and after Allied's "permission" letter. In any event, Allied's constant interest in pursuing other insurance was clearly supported by much competent evidence.

Mr. Ford indicated that he would possibly have to go to an attorney in order to make Rollins Leasing, or USF & G respond to him as to who the primary carrier should be. He stated that he would probably request for a declaratory judgment to get one or both of those companies into the picture and respond to his claim.[6]

At this time, it appears that his efforts are going to be directed toward Rollins Leasing and USF & G.

He stated he would keep me advised as to what progress he is able to make, and that he might not have an underinsured motorist claim against Allied if he can get one or both of these companies to commit to some coverage.

Ford did commence that suit, and in discovery obtained the Rollins and Darigold policies. The Rollins' policy appeared not to provide coverage for Blatter because its coverage only extended to *employees* of a lessee, here Darigold. The Darigold policy, though, which was with USF & G (Fidelity), with coverage up to $1,000,000, provided in relevant parts:

> We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies caused by an 'accident' and resulting from the.... use of a covered 'auto'.

A "covered 'auto'" was defined as:

> [T]hose 'autos' you [the insured, Darigold] lease, hire, rent, or borrow.

Finally, an "insured" was defined as:

> b. Anyone else while using with your permission a covered 'auto' you own, hire or borrow....

Since coverage under the Fidelity policy was purchased for the trailer, and Blatter was using the trailer with Darigold's permission,

therefore, Blatter fit the language as an insured vis-a-vis the Fords.

Given the foregoing, the case appears strong that had Blatter not been released, there was up to an additional $1,000,000 available to cover the Fords under the Darigold policy.[7] However, absent some hard-to-imagine independent negligence by Darigold, Ford, by releasing "permissive user" Blatter, closed off the only realistic avenue of reimbursement from the Darigold policy, notwithstanding the reservation of rights against Darigold in the release.[8] From hindsight, everybody in this action, the parties, the court below, and certainly this Court recognizes that the release of Blatter was a mistake where both Ford and Allied were specifically looking to the availability of further insurance to cover the Fords' injuries.

Prior to the trial below, the district judge granted summary judgment dismissing Rollins from this action because its policy provided that Blatter had to be an employee of its lessee Darigold to be covered, and he was not. The district judge next granted summary judgment dismissing Darigold on the ground that Blatter was an "independent contractor", though the court recognized some question as to whether the policy might or might not provide coverage to Ford because Blatter was a "permissive user" under the policy.[9] Having done that, as to Ford's summary judgment motion on Allied's contract liability, the district judge found in favor of Ford, holding Allied liable for whatever the jury should thereafter determine to be the excess of the Fords' damages over $300,000, because on the record before him, the district judge found Blatter to be an "underinsured" motorist. The district judge then commenced the trial and submitted to the jury two issues: 1) the total damages

---

6. [Court's footnote] Allied was also made a defendant in the suit which is the subject of this appeal.

7. The subsequent jury verdict established that over the $300,000 Farmers Creamery policy, the Fords' injuries were $375,000 more.

8. Both Ford and Allied were aware of the doctrine of "permissive user" coverage in many policies, which happened to be in the Darigold policy's definition of an "insured", see *supra*.

9. THE COURT: I have had an opportunity to, again, review the cross motions for summary judgment ...
 * * * * * *

I would say that the [Rollins] policy flatly does not provide coverage in this situation by its very language. And secondly, that it is doubtful, in my view, whether the [Fidelity] policy would provide coverage in that there is language that has been pointed out by the plaintiff that would suggest that the [Fidelity] policy does not cover injuries that occurred as a result of the operation of a borrowed or hired vehicle.

I realize that there is a real question that might exist in all of that....

sustained by the Fords; and 2) whether Allied dealt with Ford in "bad faith". The jury found total damages to be $675,000 and Allied not to be in "bad faith".

■ The crucial focus of our analysis of the issues raised on this appeal is upon two of the district court's grants of summary judgment; the first, dismissal of Darigold,[10] and the second, the ruling declaring Allied liable as a matter of law to the Fords for any excess over the Farmers Creamery policy. We review these rulings *de novo* and apply the same standard as used by the district court, *Panis v. Mission Hills Bank, N.A.* 60 F.3d 1486, 1489–90 (10th Cir.1995).[11] Thus, if a jury could have found that Darigold's one million dollar policy would have been applicable to Blatter's negligence, that policy would have provided full coverage to the Fords had it not been for Ford's execution of the release to Blatter. The district court's dismissal flowed, we conclude, from the court's focusing on the fact that Blatter was an independent contractor and not taking cognizance of the material fact issue as to whether a jury could have found Blatter to have been a "permissive user" within the terms of the policy. The "permissive user" issue should have been submitted to the jury, and had the jury concluded that Blatter was such a user, and therefore, that there *had been* adequate coverage for the Fords at the time of—the accident, the next issue for the jury to decide would have been, who bore the responsibility for Ford's unfortunate signing of the release of Blatter that destroyed that coverage.

Under the law of Iowa, Ford and Allied were, under normal circumstances, dealing at arm's length with each other, thus putting upon Ford, as the insured, the duty of estab-

lishing his claim before Allied was required to make payment under the policy. *Pirkl v. Northwestern Mutual Insurance Asso.*, 348 N.W.2d 633 (Iowa 1984). Allied maintains that an arms-length relationship did exist here, notwithstanding its efforts to help Ford. Some of Ford's conduct, writings and testimony, a jury could find, supports this position. Ford, however, contends that the circumstances were not normal—that Allied had taken over Ford's responsibility of establishing his claim by its efforts to obtain Rollins' and Darigold's policies, and by giving him "permission" to settle with Truck Insurance and execute a release to Blatter. These are material fact issues. Allied, as to this, asserts that while it tried to assist its insured, it advised him that it could not consider payment under its UIM provisions until all other avenues of insurance had been pursued without success. There is competent evidentiary support for this in the correspondence with Ford prior to Ford's asking permission to settle, and in Allied's letter of "permission" to settle with Farmers containing the statement that the Rollins policy must still be pursued prior to any consideration of UIM. It also appears that Ford himself, having hired an attorney to polish the release supplied him by Farmers, instructed the attorney to preserve his rights as against Darigold and Rollins.

Accordingly, on this record, there is first a major issue of material fact as to Darigold's coverage of Blatter at the time of the accident. If such coverage were found to exist by the jury, there is then the second major issue of fact as to whether Ford was in an arm's length relationship with Allied, and thus whether the sole responsibility for the

---

10. The Rollins policy at this point is irrelevant in any event because the jury by its verdict concluded the Ford's damages were only $375,000 above the Farmers Creamery policy. Therefore, the Darigold policy was more than enough to cover this and therefore, Allied's UIM coverage would not have been reached.

11. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Deepwater Invs. Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991); *Panis, supra,* at 1490.

release was his, or whether any conduct of Allied misled him or constituted a waiver or estoppel against Allied under such authorities as *Scheetz v. IMT Ins. Co.,* 324 N.W.2d 302 (Iowa 1982), with particular reference to that court's observation at 304:

> The issue of waiver is generally one of fact for the jury, in particular where acts and conduct are relied upon as the basis for the waiver.

Given all this, with such essential material facts in issue, we conclude that it was error for the district judge, by his pre-trial grants of summary judgment, to have withdrawn these ultimate issues bearing on Allied's UIM responsibilities from the jury. This requires a remand for a trial on those issues.

■ The jury's award of $675,000 as total damages is not an issue on this appeal. We have carefully examined plaintiff's cross-appeal for a new trial on the issue of Allied's "bad faith" as to which the jury found in favor of Allied. We find no merit in Ford's position, which is essentially the claim that an expert witness for Allied was permitted to testify to impermissible and inaccurate propositions of law. This claim, upon examination of the testimony cited in support, proves unfounded. What Allied's expert testified to went to the issue of bad faith, not to contract liability. The testimony was allowable in order to show the basis upon which Allied had declined payment under the UIM provisions of this policy. In that regard, the expert testified that Allied was relying on industry practice that before there is payment under UIM, one looks at the total coverage available at the time of the accident. This is supported under Iowa law by *Rucker v. National General Ins. Co.,* 442 N.W.2d 113 (Iowa 1989). The expert also testified that the industry regards the insured as being in an arm's length relationship vis-a-vis the company in this type of situation. This general principle, too, flows from Iowa law as stated in *Pirkl, supra,* at 635.[12] Ford does not explain why the witness' testimony as to the customary practice in the industry of regarding a tractor and trailer coupled together as one vehicle is an erroneous statement either factually or legally.

Ford also contends that jury instruction # 23 concerning the release signed by Ford was confusing to them. That charge reads:

> The releases signed by the plaintiffs in favor of Leland Blatter and Truck Exchange are contracts. In interpreting the effect of these Release Agreements, the primary consideration is ascertaining the intent of the parties to the Release Agreements. In ascertaining the intention of the parties, you must consider the plain meaning of the words used by the parties in the Release Agreements in light of all other facts and circumstances then existing.
>
> Whether the parties to the Release Agreements between Leland Blatter and Truck Insurance Exchange intended to preserve plaintiffs' right to pursue claims for their injuries against other insurers of Leland Blatter is for you to decide based upon the intention of the parties to the Release Agreements signed by the plaintiffs.

However, notwithstanding appellees' attack, that instruction appears to be proper guidance on the issue of the good or bad faith of Allied and is otherwise an unexceptionable instruction on the law governing inferences to be drawn from the release.

■ Ford's final contention is that the jury should have been advised that the court had granted summary judgment to Ford on his contract claim against Allied. This, however, could well have been a prejudicial factor for the jury to have before it when deciding the bad faith issue. We find no error in the district court's refusal to so advise the jury.

---

**12.** We note that the district court's jury charge # 28 is a paraphrase of language from *Pirkl, supra.* It reads:

Allied had no clearly defined duty to investigate the plaintiffs' claim for underinsured motorist benefits, and was entitled to require the plaintiffs to present adequate proof of loss before paying the claim.

This specific language was not objected to at the charge conference below, and is not the subject of question on this appeal.

In sum, the jury's damage award of $670,-000 stands unassailed. We affirm the jury's determination and resulting judgment in favor of Allied on the issue of its alleged bad faith. We remand to the district court for a trial of all other issues, first with regard to Darigold's coverage, and, if such would have existed, then a determination of which party must suffer the consequences of the release of Blatter.