**Roger E. BRADSHAW, Plaintiff,**

v.

**ST. CATHERINE'S HOSPITAL and
Steve Wilkinson, Defendants.**

**Civil Action No. 94–1565–FGT.**

United States District Court,
D. Kansas.

Aug. 7, 1997.

James S. Phillips, Jr., Phillips & Phillips, Chartered, Wichita, KS, for Roger E. Bradshaw.

Lisa Jane Lewis, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, Dwight D. Dumler, Thorn Americas, Inc., Wichita, KS, for St. Catherine's Hosp. and Steve Wilkinson.

## MEMORANDUM AND ORDER

THEIS, District Judge.

Plaintiff, Roger Bradshaw, brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Kansas law. Plaintiff alleges he was terminated from his position with St. Catherine's Hospital and otherwise discriminated against because he is African–American. Plaintiff also brings a state law claim for breach of an alleged implied employment contract. The matter is before the court on defendants' motion for summary judgment. (Doc. 51). The court has considered the parties' briefs and reviewed the applicable law and is prepared to rule.[1]

## I. Facts

The following facts are undisputed unless otherwise noted. Plaintiff is African–American. On June 15, 1992, plaintiff began his employment as manager of the patient services department at St. Catherine's Hospital in Garden City, Kansas. In that position, plaintiff reported to the Director of Finance, Robert Whippo. Plaintiff's department was responsible for billing and collecting patient accounts. Plaintiff had previously worked as an assistant accounts manager at St. Francis Hospital in Wichita, Kansas.

During the time of plaintiff's employment at St. Catherine's, defendant Steven Wilkinson was President and CEO of St. Catherine's. He left the hospital on September 30, 1995.

Shortly after starting at St. Catherine's, plaintiff initiated cross-training in his department. With cross-training, employees in one position learn the duties of another position. Several of the employees resisted cross-training and other changes Bradshaw made. Bradshaw believes some such employees were not receptive to cross-training because of a personal dislike for him. Bradshaw contends further that upper management was unsupportive of his efforts at cross-training.

Some employees felt uncomfortable working under Bradshaw. There is testimony in the record that some employees believed his management style was too dominating, unlike that of his predecessor. Plaintiff's predecessor was a European–American female. There is some evidence that one or two such employees did not like Bradshaw in part because of his race. These and other employees in Bradshaw's department left St. Catherine's during Bradshaw's tenure, but it is unclear what role dissatisfaction with Bradshaw's management of the department may have had in those departures. At any rate, any employees who were unhappy about working under Bradshaw or who resisted cross-training left St. Catherine's between September 24, 1992, and April 1, 1993.

Wilkinson believed employee morale in plaintiff's department was a problem. Some employees told Wilkinson they were afraid of Bradshaw. Others complained that Bradshaw did not allow employee input into decision-making and gave orders without relating the purpose for the orders. Wilkinson discussed the morale problem with plaintiff, telling him that some of the employees in his department felt intimidated and threatened by plaintiff. On August 4, 1992, Wilkinson had a meeting with plaintiff during which he told plaintiff that some employees believed plaintiff talked down to them and that he was not sensitive and responsive to them.

On September 29, 1992, Wilkinson conducted a meeting with Bradshaw's employees. One of the employees in attendance was one who allegedly made a racist remark about plaintiff. By the time of the meeting,

---

1. In his response to the motion for summary judgment, plaintiff indicated an intention to file a motion to compel discovery. He argued that summary judgment would be premature until the discovery matters were resolved. It has been several months since briefing was completed on the motion for summary judgment, and plaintiff has not filed a motion to compel or moved to supplement his response to the defendants' motion. The court must conclude that the record on the motion for summary judgment is complete at this time.

she had already tendered her resignation. Bradshaw was informed of the meeting, but was not allowed to attend. On October 6, 1992, Wilkinson and Whippo met with plaintiff as a follow-up to the September 29 meeting. Wilkinson told Bradshaw that before making changes in the department, he should explain the reasons for the changes and get the employees to "buy off" on the changes. Wilkinson told plaintiff that some employees felt threatened by plaintiff and believed nothing they did was right in his eyes.

As a result of his meeting with the employees in Bradshaw's department, Wilkinson concluded it was necessary to have a third party evaluate the department. Glenn Trembley was retained to conduct a "climate audit." Trembley interviewed employees in plaintiff's department and issued a report of his findings. In the report, Trembley noted that there was "some mention of race" in his interviews with employees. Wilkinson asked Trembley whether race played a role in Bradshaw's management difficulties. Trembley responded that he found little evidence to support that possibility. Wilkinson did not discuss the mention of race with Bradshaw. Wilkinson did not believe there was a need to pursue the issue further. Bradshaw had no suspicion at that time that some employees may have had a racial bias against him.

In March 1993, Wilkinson met with the employees of the Patient Services Department, including plaintiff, to discuss Trembley's report. Wilkinson told the employees at that meeting that he was supportive of the changes Bradshaw was trying to make and that the employees should work with Bradshaw to make those changes. Wilkinson also wrote a memorandum to Bradshaw regarding the climate audit. In that memorandum, Wilkinson summarized Trembley's findings and made recommendations for improving the situation in the department.

As mentioned above, plaintiff's department was responsible for accounts receivable. St. Catherine's divides its accounts receivable into three categories: the "U/R list," meaning accounts for any patient who has not been discharged from the hospital; "accounts receivable not diagnosed," which are accounts to which a diagnosis has not been applied in order to generate a bill; and "net accounts receivable," which consists of accounts that have been billed, but not collected. By February 1993, Wilkinson had become concerned about an increase in accounts receivable. He sent a memo to Bradshaw outlining his concerns and setting up a meeting. As a result of this memo and meeting, Bradshaw set goals for himself, including reducing patient accounts over ninety days old to twenty percent of gross accounts receivable and reducing the number of accounts receivable days to forty-six.[2] These goals were made contingent on reductions in accounts receivable not diagnosed.

The accounting firm of Wendling, Noe, Nelson & Johnson conducted St. Catherine's annual audit in 1993. On August 19, 1993, Wendling sent Steve Wilkinson an interim report informing Wilkinson that billed accounts receivable continued to increase "far beyond expectations." From June 1992 to June 1993, billed accounts receivable had increased more than $2.8 million. The report concluded that billed accounts receivable continued to deteriorate and goals had not been met. Wendling recommended that "action be taken as soon as possible to identify the underlying causes and remedy the current escalation of accounts receivable."

On August 15, 1993, because the goals plaintiff set had not been reached, Whippo met with plaintiff to discuss the situation. On August 19, 1993, Whippo wrote a memorandum, which stated in part:

> Gross A/R have increased $3.16M or 32.6% from June 1992 to June 1993. This includes the cashiers list and the turned accounts. Excluding these amounts, the increase is $2.97M or 50.7%. Net A/$ has increased $2.73M or 45.8% for the same time period. Over 90 day A/R have increased $897,000 or 63.0%. As we have discussed on many occasions over 90 day A/R have been a problem for many months

2. One measurement of how well billing procedures are functioning is the average number of days accounts are outstanding.

now and I am concerned that they are reaching an uncontrollable level.

. . .

Roger, I reminded you that a year ago when we hired you, we did not have a "turn-around" situation in the business office—A/R was not in a crisis situation. I am afraid we are quickly approaching a crisis situation now. The growth in A/R is totally unacceptable given the marginal increase in business the hospital has experienced.

Wendling testified in deposition that accounts receivable are a hospital's greatest controllable asset. Hospital directors are always interested in accounts receivable. Plaintiff agrees that St. Catherine's management had a right to be concerned about the state of its accounts receivable. Plaintiff agreed further that Wilkinson would have seen accounts receivable in August 1993 as approaching a crisis situation. At one point in 1993, accounts receivable represented 25% of St. Catherine's total assets.

Plaintiff alleges a number of conversations which he contends are examples of racial hostility. Plaintiff contends Wilkinson told plaintiff he might face trouble in the Garden City community because his wife is white. Wilkinson expressed no personal disapproval of inter-racial marriages. Plaintiff alleges no other remarks by Wilkinson related to plaintiff's race. However, plaintiff does allege that Wilkinson told plaintiff he was hearing bad things about plaintiff in the community. Bob Whippo allegedly said that Wilkinson did not like plaintiff. One employee from plaintiff's department, upon seeing plaintiff and his wife at a local store, indicated her disapproval of inter-racial marriages by stating, "I was not raised that way." Finally, a hospital employee overheard another employee state that she "could not work for that nigger." Whippo was made aware of this comment.

Plaintiff's employment at St. Catherine's was terminated on September 27, 1993. Wilkinson made the decision to terminate plaintiff, with input from Whippo. Upon plaintiff's termination, Wilkinson put Whippo in charge of accounts receivable, which began to decrease. Plaintiff contends after he was discharged, management gave extra priority to reducing accounts receivable. Plaintiff

eventually was replaced by Jim Perez. There is no indication in the record that Perez is African–American.

## II. Summary Judgment Standards

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . . " *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2551. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2552 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must

demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513.

## III. Race Discrimination Claims

In this case, plaintiff alleges that defendants discriminated against him based on his race in terminating him and in setting the terms and conditions of his employment. Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). 42 U.S.C. § 1981 prohibits race discrimination in making and enforcing contracts. The analysis of a race discrimination claim is the same under Title VII and § 1981. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989); *Durham v. Xerox Corp.,* 18 F.3d 836, 839 (10th Cir.1994).

When alleging disparate treatment, the plaintiff must prove by a preponderance of the evidence that the defendant had a discriminatory motive or intent. *Sorensen v. City of Aurora,* 984 F.2d 349, 351 (10th Cir. 1993). This may be done either by direct proof of discriminatory intent or, more commonly, through the well-established burden-shifting format. *Id.* at 351–52.

Where the plaintiff has presented no direct evidence of discriminatory motive or intent on the part of defendant, analysis of the plaintiff's claims under Title VII begins with the burden-shifting format set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At step one, the plaintiff is required to prove a prima facie case of discrimination. The elements of the prima facie case vary somewhat according to the plaintiff's precise allegations, which the court discusses separately below. Once the plaintiff has established a

prima facie case, the burden of production shifts to the defendant to rebut the presumption of discrimination. The defendant may rebut the presumption by articulating some legitimate, nondiscriminatory reason for the employment decision. If the defendant succeeds in rebutting the presumption of discrimination raised by the prima facie case, the inquiry returns to whether or not the plaintiff has met her burden of persuasion. Thus, at step three, the plaintiff must prove by a preponderance of all the evidence that the reasons offered by the defendant were a pretext for discrimination. *See Sorensen,* 984 F.2d at 352; *EEOC v. Flasher Co.,* 986 F.2d 1312, 1316 (10th Cir.1992). The presumption in plaintiff's favor that arose from the establishment of a prima facie case drops from the case. *Flasher Co.,* 986 F.2d at 1316.

The plaintiff can prevail either directly, by proving that the employer acted with a discriminatory motive, or indirectly, by showing that the stated reason for the employment action was a pretext for unlawful discrimination. *Id.* at 1317. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). *See also Sorensen,* 984 F.2d at 351.

### A. Termination

■ In order to set forth a prima facie case for discriminatory discharge, a plaintiff must establish (1) that he is a member of a protected class, (2) that he was qualified for the position he held, (3) that he was terminated despite his qualifications, and (4) that he was replaced by a person outside the protected class, *Rhodeman v. Robertson & Penn, Inc.,* 807 F.Supp. 103, 106 (D.Kan. 1992), or that his position remained open and his employer sought applications from people no more qualified than the plaintiff. *Trujillo v. Grand Junction Regional Ctr.,* 928 F.2d 973, 977 (10th Cir.1991).

■ In this case, there really is no question that plaintiff has stated a prima facie case. The court, therefore, turns to step

two. At this step, defendants argue that plaintiff was terminated because total accounts receivable had risen to an unacceptable level under his management, placing the hospital in a precarious financial situation. This is a legitimate nondiscriminatory reason for termination. The court must consider, then, plaintiff's contention that the stated reason is a pretext for unlawful discrimination.[3]

As evidence of pretext, plaintiff argues first that the hospital failed to discipline, much less terminate, other managers under whose direction accounts receivable had risen. These other managers include plaintiff's predecessor, Milliard, and Lisa Libby, who was responsible for accounts receivable not diagnosed. However, there is no evidence in the record that accounts receivable rose to the extreme levels that they did under plaintiff's watch.

Plaintiff next argues that he was not to blame for the rise in accounts receivable. He contends first that accounts receivable not diagnosed was the responsibility of Lisa Libby, not plaintiff. Plaintiff also argues that racial animus within his department played a role in the lack of productivity within his department. Viewed in the light most favorable to the plaintiff, the evidence shows that Wilkinson and Whippo had notice of racial hostility within the department and did not investigate what role it, and the resulting resignations, may have played in plaintiff's inability to keep accounts receivable at a manageable level.

Plaintiff also contends Wilkinson made a racially derogatory remark to him concerning his inter-racial marriage. The court concludes the remark is, at worst, ambiguous.[4] However, considering all the evidence together, there is a genuine issue of material fact regarding whether defendants' stated reason for terminating plaintiff was a pretext for racial discrimination. The court seriously doubts that a trier of fact would be persuaded by plaintiff's evidence. However, it is just enough to survive summary judgment.

### B. Terms and Conditions of Employment

In addition to wrongful termination, plaintiff contends defendants discriminated in the terms and conditions of his employment. Plaintiff alleges that he was required to move from Jetmore to Garden City, that defendants held at least one meeting with employees under plaintiff's supervision and did not permit him to attend, that defendants permitted employees to make unsubstantiated allegations against plaintiff, that defendants undermined plaintiff's authority by failing to support him, and that plaintiff was unfairly evaluated. As to these allegations, plaintiff has failed to present direct evidence of discrimination. He has also failed to allege or offer evidence that he was treated differently from similarly situated white employees in these regards.

Finally, plaintiff alleges that defendants created expectations of him not required of similarly situated white employees.[5] However, plaintiff has failed to identify such expectations or provide evidence of what was expected of similarly situated white employees.

Plaintiff has failed to present a prima facie case of discrimination as to the terms and conditions of his employment. Accordingly, defendants are entitled to summary judgment on this claim.

### IV. Implied Employment Contract

Kansas follows the common law doctrine of employment at will. Under that doctrine, employees are considered to be at will in the absence of an express or implied

---

**3.** Plaintiff contends that employee morale was not a true reason for his termination. The court does not address that issue because the only reason defendants proffered for terminating plaintiff was the rise in accounts receivable. However, the court must consider any evidence that employee morale, and employees' racist attitudes in particular, contributed to the increase in accounts receivable.

**4.** Because the remark is ambiguous, it does not constitute direct evidence of discrimination. *But*

*see Wilson v. City of Aliceville,* 779 F.2d 631, 634–36 (11th Cir.1986) (holding that trial court erred in failing to admit facially racist statement which constituted direct evidence of discrimination, taking the case out of the McDonnell–Douglas burden shifting format).

**5.** The court has considered these allegations to the extent they bear on plaintiff's discriminatory termination claim.

contract. *Anglemyer v. Hamilton County Hospital,* 58 F.3d 533, 537 (10th Cir.1995). Employment is terminable at the will of either the employer or the employee for good cause or no cause at all. *Panis v. Mission Hills Bank. N.A.,* 60 F.3d 1486, 1492 (10th Cir.1995), *cert. denied,* 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996).

■ In this case, plaintiff alleges a breach of an implied employment contract. The existence of an implied contract depends on the intent of the parties, based on the totality of the circumstances. *Anglemyer,* 58 F.3d at 537. The Kansas Supreme Court has outlined the factors to be considered in determining the existence of an implied contract.

> Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Morriss v. Coleman Co.,* 241 Kan. 501, 510, 738 P.2d 841 (1987).

■ A mutual intent to form a contract is necessary to show that an implied in fact contact exists. A unilateral expectation on the part of the employee does not create an implied in fact contract for continued employment. *Panis,* 60 F.3d at 1492.

■ Whether an implied-in-fact contract exists is a question of fact. *Panis,* 60 F.3d at 1492. Under Kansas law, summary judgment is rarely appropriate in implied employment contract cases because of the necessity of determining both parties' subjective intent to form a contract. *Anglemyer,* 58 F.3d at 537.

■ In this case, plaintiff has presented evidence of an implied employment contract. First, employees at St. Catherine's were provided with employee handbooks outlining the hospital's system of progressive discipline.

Although the handbooks contained disclaimers that the handbook was not to be construed as a contract and that employees could be terminated at will, such disclaimers are insufficient to resolve the issue as a matter of law. *Id.* at 538 n. 2. Also in the record are statements of plaintiff's superiors that the hospital's policy was to retain employees unless there was cause to terminate. This evidence is sufficient to create a genuine issue of material fact under the Tenth Circuit's holding in *Anglemyer. Id.* at 538.

In their initial brief, defendants argued only the existence of an implied contract, raising the issue of whether they had cause to terminate plaintiff only in the reply brief. Therefore, the court does not consider that argument. The court denies defendants' motion for summary judgment as to plaintiff's state law claim for breach of implied employment contract.

**IT IS BY THIS COURT THEREFORE ORDERED** that defendants' motion for summary judgment (Doc. 51) is hereby granted in part and denied in part.