**Tammy KOEHLER, Plaintiff,**

v.

**HUNTER CARE CENTERS, INC., Defendant.**

**No. CIV.A. 96–1320–FGT.**

United States District Court, D. Kansas.

May 20, 1998.

David W. Nickel, Depew & Gillen, L.L.C., Wichita, KS, for Plaintiff.

Alexander B. Mitchell, II, Klenda Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, for Defendant.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

Plaintiff brings this diversity action under Kansas law contending she was terminated from her employment with the defendant in retaliation for her "whistle-blowing" and for her having filed an unemployment compensation claim. Plaintiff also alleges breach of an implied employment contract and defamation. The matter is before the court on defendant's motion for summary judgment.

## I. Facts

The following facts are uncontroverted or stated in the light most favorable to the plaintiff.

Plaintiff is a Licensed Practical Nurse ("LPN"). She was employed by the defendant at its Friendship Manor ("FMA") facility in Anthony, Kansas, on March 1, 1993. Plaintiff worked full time on the day shift. In May 1994, plaintiff took a three-month leave of absence from her job at FMA. Plaintiff took the leave of absence to serve a jail sentence in Oklahoma for DUI.

Before her leave of absence, plaintiff was promised that she would be able to return to her full time, day shift position after her leave was over. When plaintiff returned, however, she was told there was only part time work available. This was unacceptable to the plaintiff, who was the single mother of four minor children. Furthermore, Brenda Thornton, the Executive Administrator at FMA at that time, told plaintiff she would be required to enroll in the Kansas Nurse Assistance Program before returning to work. Plaintiff did not agree to this condition. She filed a claim for unemployment compensation. On September 12, 1994, Thornton again told plaintiff that there were no full time, day shift positions available. However, on September 13, 1994, such a position was offered to plaintiff, with no requirement of entering the peer assistance program, and plaintiff accepted.

FMA contested plaintiff's claim for unemployment benefits for the period before September 14, 1994, when she returned to work. Thornton told plaintiff that pursuing the claim would mean taking time off without pay for hearings, while Thornton would be paid for her time contesting the claim. Thornton told plaintiff that she had everything to lose and Thornton had everything to gain if plaintiff continued with her claim.

After plaintiff returned to work, Thornton was rude and discourteous to plaintiff. She would ignore plaintiff's greetings. Sometimes, she yelled at plaintiff in front of other employees. Thornton also gave plaintiff extra work that was not required of other LPNs. Another LPN intervened and called a meeting between plaintiff, Thornton and himself. During that meeting, Thornton stated that she did not have a problem with plaintiff's work, and that she did not like people who sued the company.

Three months after returning to work, plaintiff received a performance evaluation by Christina Salsberry, then Director of Nursing. The evaluation was favorable in every category, and did not include any criticisms. Brenda Thornton testified that she agreed with the evaluation, except that it should have included areas that needed improvement. In particular, Thornton believed plaintiff should have been told that she should not try to "stir up problems."

On a number of occasions, plaintiff went to Thornton with reports of mistreatment of patients, improper performance of procedures on patients, and understaffing of shifts. Plaintiff made several reports about Wanda Sherven, another LPN, including that Sherven had improperly installed a Foley catheter and urine bag in such a way that the patient could not urinate and that she had once not allowed a patient a bed. In June 1995, plaintiff reported that Christina Salsberry, an FMA Registered Nurse, was falsifying her time records. This was not only a fraud on the company, but also caused FMA to be in violation of a Kansas law requiring an RN to be on duty at least eight hours every day.

Within two weeks after reporting the falsification of time records, plaintiff was told that she would be required to work the second shift. Again, this was unacceptable to plaintiff because she had four minor children at home. Plaintiff filed a grievance and wrote a letter to the Regional Director concerning the shift change. Plaintiff worked second shift under protest.

Rita James took over as Executive Director at FMA in July 1995. After she was hired, James learned of plaintiff's whistleblowing activities. Also in July 1995, Linda Leslie became Director of Nursing at FMA. On August 14, 1995, Wanda Sherven reported to Leslie that plaintiff had debrided a decubitus ulcer on a patient using a scalpel and a pair of unsterilized scissors taken from her pocket. However, Sherven was not in the room at the time plaintiff debrided the decubitus ulcer. The only people in the room were the plaintiff, the patient, and Ron Armstrong, a certified nurse's assistant who was helping plaintiff. Armstrong was unable to see what plaintiff was doing or what instruments she used from his position. Nevertheless, Thornton required Armstrong to make a statement that he saw plaintiff use a scalpel to debride the decubitus ulcer. After plaintiff's termination, Armstrong asked to correct his statement, but was not allowed to do so.

On August 15, 1995, plaintiff was suspended pending investigation of Sherven's allegations. Plaintiff made no comments on the employee memorandum and refused to sign it. On August 30, 1995, plaintiff was terminated for improperly debriding a decubitus ulcer. Rita James, who by that time was Executive Director at FMA, told plaintiff that if she resigned, defendant would not report her to the Kansas Board of Nursing. Plaintiff refused to resign, and defendant did report her to the Board.

Plaintiff admits she performed the debridement, but contends she did not use a scalpel, but used only sterile scissors taken from a sealed suture removal kit. Using unsterilized scissors to perform the procedure would pose a danger of infection. LPNs are not authorized to use scalpels as instruments. Plaintiff performed the debridement at the direction of Marcia Drewry, D.O., who is also the patient's daughter-in-law. Dr. Drewry believes plaintiff did an excellent job at debriding the decubitus ulcer and states that the patient's condition improved after the procedure was performed.

## II. Summary Judgment Standards

The standards governing the consideration of a motion for summary judgment are well established. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106

S.Ct. 2548. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. 2548 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed. R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505.

## IV. Plaintiff's Affidavit Evidence

■ As an initial matter, the court considers defendant's argument that plaintiff's affidavit should be disregarded to the extent it is inconsistent with her prior deposition testimony and sworn statement to the Kansas Human Rights Commission ("KHRC"). It is well established that a party opposing a motion for summary judgment cannot establish a genuine issue of fact by offering an affidavit which conflicts with the affiant's prior deposition testimony. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). In this case, defendant argues that plaintiff's evidence of retaliation conflicts with her prior statements that defendant discriminated against her based on its perception that she was disabled by alcoholism. The court disagrees. Plaintiff did answer deposition questions about plaintiff's claim of disability discrimination. The court concludes that these questions were not so open-ended as to permit plaintiff to discuss her allegations of retaliation. In other parts of plaintiff's deposition, she did discuss evidence of retaliation. Therefore, plaintiff's affidavit discussing retaliation does not conflict with her prior deposition testimony about disability discrimination. Furthermore, it is immaterial that

plaintiff did not include allegations of retaliation in her KHRC complaint. Plaintiff could not pursue these claims with the KHRC, so there was no reason for her to raise these issues at the administrative level.

## III. Retaliatory Discharge

■ Plaintiff first alleges she was terminated in retaliation for filing an unemployment compensation claim and for whistle-blowing. The Kansas courts recognize a cause of action for retaliatory discharge where the plaintiff was terminated for reporting serious infractions of law by co-workers or the employer to either company management or law enforcement. *Palmer v. Brown*, 242 Kan. 893, syl. ¶ 2, 752 P.2d 685 (1988). To make a claim, the plaintiff must show by clear and convincing evidence: (1) A reasonable person would have concluded that co-worker/company activities violated rules pertaining to public health, safety and general welfare; (2) the employer had knowledge of the report; and (3) the employee was terminated for making the report. *Id.* at 900, 752 P.2d 685. The employee must have made the report in good faith, rather than out of a corrupt motive, such as malice, spite, jealousy or personal gain.

■ The only element of plaintiff's claim at issue on summary judgment is the third. Defendant claims plaintiff was terminated for debriding a decubitus ulcer in an improper manner and not for her whistle-blowing activities. However, viewed in the light most favorable to the plaintiff, the evidence is sufficient to withstand summary judgment. When plaintiff reported violations of rules, she was told to quit picking on her coworkers. Her first supervisor testified on deposition that plaintiff should have been criticized during the evaluation process for trying to "stir up problems." *See Moyer v. Allen Freight Lines, Inc.*, 20 Kan.App.2d 203, 207, 885 P.2d 391 (1994) (evidence that management was displeased with her reports of equipment failure as supporting plaintiff's claim). Plaintiff was terminated within weeks of reporting falsification of time records, one of the more serious violations of state law. Both supervisors testified that they had reason to believe plaintiff's report

was accurate. Furthermore, as discussed below in connection with plaintiff's defamation claim, there is reason to question whether the defendant had a good faith belief that plaintiff had done the act for which they claim to have terminated her. Because there is sufficient evidence that plaintiff was terminated for reporting violations of the law to her employer, summary judgment is denied as to that claim.

■ Plaintiff also makes a retaliatory discharge claim based on her having filed for unemployment compensation. Although the Kansas courts have not specifically addressed the issue,[1] there is no question raised in this case that Kansas would recognize a cause of action for retaliation under such circumstances. Defendant again argues that plaintiff's termination was for a reason other than her having filed an unemployment claim. However, the plaintiff has presented evidence that she was treated poorly by her supervisor after filing for unemployment. Furthermore, plaintiff's supervisor commented that she had no problem with plaintiff's work, but did not like people who sued the company. Under the circumstances, the comment could reasonably be construed as referring to plaintiff's unemployment claim. The court concludes this evidence is sufficient to withstand summary judgment.

## IV. Implied Employment Contract

■ Kansas follows the common law doctrine of employment at will. Under that doctrine, employees are considered to be at will in the absence of an express or implied contract. *Anglemyer v. Hamilton County Hospital,* 58 F.3d 533, 537 (10th Cir.1995). Employment is terminable at the will of either the employer or the employee for good cause or no cause at all. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1492 (10th Cir.1995), *cert. denied,* 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996).

■ In this case, plaintiff alleges a breach of an implied employment contract. The existence of an implied contract depends on the intent of the parties, based on the totality of the circumstances. *Anglemyer,* 58 F.3d at 537. The Kansas Supreme Court has outlined the factors to be considered in determining the existence of an implied contract.

> Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Morriss v. Coleman Co.,* 241 Kan. 501, 510, 738 P.2d 841 (1987).

■■ A mutual intent to form a contract is necessary to show that an implied in fact contact exists. A unilateral expectation on the part of the employee does not create an implied in fact contract for continued employment. *Panis,* 60 F.3d at 1492.

■ Whether an implied-in-fact contract exists is a question of fact. *Panis,* 60 F.3d at 1492. Under Kansas law, summary judgment is rarely appropriate in implied employment contract cases because of the necessity of determining both parties' subjective intent to form a contract. *Anglemyer,* 58 F.3d at 537.

■ In this case, plaintiff has presented evidence of an implied employment contract. First, employees at Hunter Care Centers were provided with employee handbooks outlining the hospital's system of progressive discipline. Although the handbooks contained disclaimers that the handbook was not to be construed as a contract and that em-

---

1. Judge O'Connor permitted a plaintiff to go forward with a claim of retaliatory discharge where the plaintiff alleged termination in retaliation for testifying at an unemployment compensation hearing. *Kistler v. Life Care Centers of America, Inc.,* 620 F.Supp. 1268, 1269 (D.Kan. 1985). The plaintiff in *Moyer,* 20 Kan.App.2d 203, 885 P.2d 391, had claimed retaliation for filing for unemployment compensation, *id.* at 204, 885 P.2d 391, but the claim was not at issue on appeal.

ployees could be terminated at will, such disclaimers are insufficient to resolve the issue as a matter of law. *Id.* at 538 n. 2. Also in the record are statements of plaintiff's superiors indicating that the company's policy was to retain employees unless there was cause to terminate. This evidence is sufficient to create a genuine issue of material fact under the Tenth Circuit's holding in *Anglemyer. Id.* at 538.

In its motion for summary judgment, defendant argues only the existence of a contract and does not argue that it had cause to terminate the plaintiff. Because there is a genuine issue of material fact as to the intent of the parties, the court denies summary judgment on this claim.

## V. Defamation

 "The tort of defamation includes both libel and slander. The elements of the wrong include [1] false and defamatory words [2] communicated to a third person [3] which result in harm to the reputation of the person defamed. A corporation may be liable for the defamatory utterances of its agent which are made while acting within the scope of his authority." *Luttrell v. United Telephone System, Inc.,* 9 Kan.App.2d 620, 620–21, 683 P.2d 1292 (1984), *aff'd,* 236 Kan. 710, 695 P.2d 1279 (1985) (citations omitted).

In this case, defendant argues its conduct is privileged under Kansas law and, therefore, cannot form the basis of a defamation claim. K.S.A. § 65–1127(a) provides:

> No person reporting to the board of nursing under oath and in good faith any information such person may have relating to alleged incidents of malpractice or the qualifications, fitness or character of a person licensed to practice professional nursing or licensed to practice practical nursing shall be subject to a civil action for damages as a result of reporting such information.

The court agrees that this section, where applicable, provides immunity from liability on a defamation claim. However, in this case, there is a genuine issue whether the defendant acted in good faith when it reported plaintiff to the board. Viewed in the light most favorable to the plaintiff, the evidence shows that the defendant concluded plaintiff had acted improperly based on the statement of one employee who the defendant knew had reason to retaliate against plaintiff. The defendant then forced a CNA to make a statement he claims had significant misrepresentations of fact and would not later permit him to amend the statement. Finally, the defendant used the information it had gathered to threaten the plaintiff. Defendant told plaintiff it would not report her to the board if she resigned rather than forcing defendant to terminate her. Under these circumstances, the court cannot conclude as a matter of law that the defendant has good faith immunity under § 65–1127(a). Summary judgment is denied as to plaintiff's defamation claim.

Any remaining issues not discussed have been considered and rejected rather than overlooked.

**IT IS BY THIS COURT THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. 24) is hereby denied.